# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| E.S., the student and K.W. and | ) | |
| S.W., the student's parents, | ) | |
|     Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-00283 |
| | ) | Chief Judge Crenshaw / Frensley |
| CLARKSVILLE MONTGOMERY | ) | |
| COUNTY SCHOOL SYSTEM; | ) | |
| FRANCES CAMP, Individually; | ) | |
| DEBORAH WORK, Individually; | ) | |
| CHRISTINA CARNALL, Individually; | ) | |
| And KYLA BOYD, Individually, | ) | |
|     Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

This matter is before the Court upon cross-Motions for Judgment on the Administrative Record seeking judgment solely on "Plaintiffs' administrative claims heard under the Individuals with Disabilities Education Act," 20 U.S.C. §1400 *et seq.* against Defendant Clarksville Montgomery County School System ("CMCSS"). Docket Nos. 46, 51.[1] In support of their Motion, Plaintiffs have filed a supporting Memorandum of Law and a redacted transcript from the November 8, 2022, proceeding before the undersigned. Docket Nos. 47-48.

Defendant has filed a combined Response and Motion for Judgment on the Administrative Pleading. Docket No. 51.

Plaintiffs have filed a Reply to Defendants' Response, which also serves as their Response to Defendant's Motion. Docket No. 52. For the reasons discussed below, the undersigned finds

---

[1] Claims for damages under Plaintiffs' other causes of action or against the individual Defendants are not included in the instant cross-Motions. *See* Docket Nos. 46, 51.

that Plaintiffs have failed to carry their burden and establish either that Defendant denied E. S. a FAPE or that Sumner Academy was an appropriate placement. The undersigned therefore recommends that Plaintiffs' Motion for Judgment on the Administrative Record be DENIED, Defendant's Motion for Judgment on the Administrative Record be GRANTED, and Plaintiffs' IDEA claims be DISMISSED. As only Plaintiffs' IDEA claims are presently before the Court, this Report and Recommendation expresses no findings or opinions on the remainder of Plaintiffs claims.

## II.    BACKGROUND

Plaintiffs filed this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Special Education Behavior Supports Act ("SEBSA"), Tenn. Code Ann. §49-10-1301 *et. seq.*;[2] Tenn. Code Ann. § 49-10-601 *et seq.*; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et. seq.; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; as well as state law claims of false imprisonment and battery pursuant to 28 U.S.C. § 1367. Docket Nos. 1; 32. As noted above, only Plaintiffs' claims brought under the IDEA are presently before the Court.

Prior to instituting the instant action, this matter was the subject of a four-day administrative hearing held under the IDEA on September 15-17, 2020, and October 16, 2020, after which the Administrative Law Judge ("ALJ") issued a final order denying Plaintiffs relief. *See* Docket Nos. 1-1; 32-1, ALJ Final Order, March 10, 2021. On April 7, 2021, Plaintiffs filed a timely appeal of the ALJ's denial. *See* Docket Nos. 1; 32.

---

[2] Tennessee's restraint law, the SEBSA, is incorporated into the IDEA. *N.S. v. Tenn. Dep't of Educ.*, No. 3:16-cv-00610, 2017 U.S. Dist. LEXIS 55941, at *28 (M.D. Tenn. Apr. 12, 2017). Under SEBSA, and the IDEA through incorporation, a restraint can only occur in an "emergency" situation. *Id.*

2

As pertains to their IDEA claims which form the basis of the cross-Motions now before the Court, Plaintiffs argue that: (1) the ALJ's Final Order erred in finding that the evidence did not support their allegations against CMCSS or support their assertion that Sumner Academy was an appropriate placement under the IDEA; and (2) E.S. was denied a free appropriate public education ("FAPE") such that they are entitled to, *inter alia*, be made "whole by awarding E.S. compensatory education and/or the educational services she would have received in the absence of CMCSS' unlawful conduct"; "an Order requiring CMCSS to reimburse Plaintiffs for costs and expenses associated with E.S.'s private educational programming, including related services, for the 2019-2020 and 2020-2021 school years"; "an Order requiring Defendants to be responsible for payment of Plaintiffs' damages including compensatory damages and reimbursement for their out-of-pocket expenses"; "an Order upholding the current educational placement of E.S. at Sumner Academy for the duration of these proceedings, such placement to continue until CMCSS rectifies its deficient educational programming as it relates to E.S. and complies with any and all Orders issued by this Court"; declaratory relief; "attorneys' fees and costs associated with the current litigation as well as the underlying due process litigation"; and "other relief and benefits" as the Court "deems appropriate" and "the cause of justice may require." Docket Nos. 47, 1.

Defendant, in its Response and Motion, argues that: (1) it provided E.S. with a FAPE; (2) it did not violate the SEBSA; (3) Sumner Academy is not an appropriate placement as defined by relevant case law and therefore does not qualify for tuition reimbursement; and (4) it did not commit any procedural violations of the IDEA. Docket No. 51. Defendant therefore seeks a judgment on the administrative record against Plaintiffs' IDEA claims.

Plaintiffs, in their Reply and Response reiterate their contention that Defendant failed to provide E.S. with a FAPE during the 2018-2019 school year by: (1) failing to develop an IEP that

was reasonably calculated to provide E.S. with educational benefit; (2) failing to identify the root cause of her avoidance behaviors; (3) violating SEBSA; (4) failing to follow E.S.'s behavior intervention plan; and (5) changing E.S.'s educational placement without amending her IEP. Docket No. 52, *citing* Docket No. 47, p. 17-18. Plaintiffs also argue that Sumner Academy was an appropriate placement because: (1) they intentionally worked toward establishing a rapport with E.S. instead of focusing solely on academics, which allowed her to learn to trust school personnel; and (2) they shared information with her teachers and provided her with a more challenging curriculum, including an advanced math class. *Id.* Plaintiffs reiterate their contention that their Motion "should be granted, and they should be found to be the prevailing party for the IDEA claims pled in this matter." *Id.*

### III.     ALJ'S FINDINGS OF FACT

As noted, this matter was the subject of a four-day administrative hearing held under the IDEA on September 15-17, 2020, and October 16, 2020, after which the ALJ issued a final order denying Plaintiffs relief. *See* Docket No. 15, Sealed Administrative Record, and Docket Nos. 1-1; 32-1, ALJ Final Order, March 10, 2021. Within his Order denying Plaintiffs relief, the ALJ made comprehensive findings of fact.[3] The relevant findings are as follows:

### Background

1.      The student, E.S. [was, at the time of the ALJ's decision] a ten-year-old (DOB 07/21/2010) young lady who enrolled at Sumner Academy in Gallatin, Tennessee, on July 23, 2019.

4.      E.S. was initially evaluated for eligibility for special education in 2017.

5.      The claims set forth in Petitioners' Complaint in this matter revolve around the 2018-2019 school year when E.S. was in third grade.

---

[3] The evidence cited by the ALJ is found in Docket No. 15, the Sealed Administrative Record.

## Witnesses

6. Stephani Cook, Ed.S., is a licensed school psychologist. She was employed by the district during the 2017-2018 and 2018-2019 school years. She completed E.S.'s psychoeducational report on November 6, 2017.

7. Deborah Work is a special education teacher at Rossview. She was E.S.'s case manager during the 2018-2019 school year. Ms. Work has a bachelor's degree and master's degree in Special Education. She has been a special education teacher since 1988. In addition, Ms. Work has been trained in the CRT and CPI methods of restraint for 10-15 years. Ms. Work was qualified as an expert in special education and in restraint, transport, and calming techniques.

9. George Martinez is a Command Sergeant Major (CSM) with the United States Army, Fifth Battalion Regiment stationed at Fort Campbell. S.W. is one of his soldiers.

10. S.W. is K.W.'s husband and E.S.'s stepfather. He is a UH-60 Blackhawk repairer with the military.

11. Madeline Haller served as the principal at Rossview during the 2018-2019 school year. Ms. Haller has been in education since 1987 as a teacher or administrator. She has a bachelor's degree in science, a master's degree in administration and supervision and an Ed.S. in administration and supervision. Ms. Haller was qualified as an expert in administration and supervision.

12. Timothy Brotsch is a Staff Sergeant with the United States Army stationed at Fort Campbell.

14. K.W. is the mother of E.S.

15. Melinda Dillehay is a teacher at Sumner Academy in Gallatin, Tennessee. Prior to the Fall of 2020 she was the Director of the Lower School at Sumner Academy. She has been licensed to teach in Tennessee for more than 47 years. She has a master's degree in elementary administration.

17. Holly Jackson is one of the elementary special population's coordinators for CMCSS. She also oversees or assists in special education matters in the elementary schools and supervises the behavior consultant team. Since 2004 she has served as a special education teacher, behavioral consultant, or coordinator. She holds a bachelor's degree in special education and a master's degree in psychology. Ms. Jackson was qualified as an expert in special education and behavioral issues in a school setting.

18. Christina Carnall was an educational assistant who worked with E.S. during the 2018-2019 school year.

19. Frances Camp is the Assistant Principal at Rossview during the 2018-2019 school year. She has held that position for more than 11 years. She holds a bachelor's degree in elementary education and a master's degree in administration supervision. She is a licensed K-8 teacher and a licensed professional administrator. She is certified in restraints. Ms. Camp was qualified as an expert in administration and supervision.

20. Andrea Kean was E.S.'s general education teacher during the 2018-2019 school year. She has a bachelor's and a master's degree in education. She was a licensed teacher with more than 15 years of teaching experience. Ms. Kean was qualified as an expert in general education.

22. Shelby Largent is a criminal investigator with the Montgomery County Sheriff's Office Special Victim's Unit. During the 2018-2019 school year Detective Largent was a School Resources Officer (SRO) with the Montgomery County Sheriff's Office assigned to Rossview. Detective Largent has 7 years of experience in law enforcement and a bachelor's degree in criminal justice.

### Eligibility for Special Education

23. E.S. was initially evaluated for eligibility for special education in 2017 by Stephani Cook. E.S. was seven years old at the time. The referral was made due to E.S.'s excessive behavioral difficulties and her above average academic skills. (Hr. Transcript, Vol. I, p. 14, Lines 2-13, Exhibit 1).

25. Dr. Glasscock's letter stated that he had diagnosed E.S. with ADHD, Disruptive Behavior Disorder and Impulse Disorder. (Exhibit 2).

30. Based on the results of the Woodcock-Johnson [test], E.S. was achieving at a high level in most academic areas with a relative weakness in math. (Exhibit 1).

32. Based on the teacher ratings, E.S.'s scores on the BASC placed her in the at-risk range in the areas of hyperactivity, aggression, anxiety, withdrawal adaptability, study skills, bullying, developmental social disorders, executive functioning, negative emotionality and resiliency. The scores place in her in the Clinically Significant range for conduct problems, depression, atypicality, anger control and emotional self-control. (Exhibit 1).

33. Specifically, the teachers reported the following behavior concerns: E.S. is considered to be restless and impulsive, and has difficulty maintaining her

6

self-control; E.S. sometimes displays aggressive behaviors, such as being defiant, argumentative and/or threatening to others; E.S. frequently engages in rule-breaking behavior such as cheating, deception and/or stealing; displays behaviors stemming from worry, nervousness and/or fear; E.S. is withdrawn, pessimistic or sad; E.S. engages in behavior that are considered strange or odd and she generally seems disconnected from her surroundings; E.S. has difficulty making friends and/or is sometimes unwilling to join group activities; E.S. has difficulty adapting to changing situations and takes longer to recover from difficult situations; E.S. demonstrates weak study skills, is poorly organized and has difficulty turning in assignments on time; E.S. has a tendency to become irritable quickly and has difficulty maintaining her self-control when faced with adversity; and E.S. has a tendency to become easily upset, frustrated, and/or angered in response to environmental changes. The ratings also indicate that suicidal tendencies should be explored. (Exhibit 1).

34. Ms. Cook testified that 'at risk' indicates that follow-up is required. 'Clinically significant' indicates that the behaviors are concerning compared to other students her age. (Hr. Transcript, Vol. I, p. 29, Lines 20-25, p. 30, Line 1).

36. Ms. Cook also testified that E.S. is capable of making choices and following school rules. However, 'it's extremely difficult to differentiate between what are choice behaviors and what are true emotional disturbances. She scored high on hyperactivity, which could be related to a diagnosis of ADHD. Anxiety can sometimes look like choice behaviors if there are overt decisions, anger, aggression. It would be very difficult unless I'm looking at a specific incident of specific behavior to say it is or is not every single time.' (Hr. Transcript, Vol. I, p. 43, Lines 19-25, p. 44, Lines 1, 18-25, p. 45, Lines 1-2).

38 In the school setting, teachers rated E.S.'s adaptive skills as below average in almost all areas. (Exhibit 1).

43. Ms. Cook testified that despite E.S.'s Emotional Disturbance designation that she is capable of making choices, including whether to follow school rules or not to follow school rules. (Hr. Transcript, Vol. I, p. 43, lines 19-25, p. 44, line 1).

**IEP/FBA/BIP**

45. On November 6, 2017, E.S.'s IEP team met to develop E.S.'s annual IEP. (Exhibit 4).

46. The Special Considerations section of the IEP states indicates that E.S.'s behavior impedes her learning or the learning of others. The section also

7

states that a Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP") will be used to address E.S.'s behavior. The IEP also notes that E.S. will be removed from the classroom and gifted services will not be made up if E.S.'s behavior impedes the learning of others. (Exhibit 4).

50. The Social/Emotional Behavior PLOPs include the assessment data from the psychoeducational evaluation that was completed by Ms. Cook. The section also includes a narrative that states 'E.S. struggles to attend P.E. and recess with her peers. She will often refuse to participate and/or go outside. E.S. struggles with tasks she perceives as pointless or trivial. She will refuse to complete them. When confronted, she will become angry and use inappropriate language, elope or pout extensively.' The Impact of Mastery of Standards section states that E.S. will refuse to follow directives, disrupt the learning environment, destroy classroom materials and become aggressive towards adults. (Exhibit 4).

79. It is noted that K.W. participated in the IEP development and approved implementation at the annual IEP Team meeting in 2018. She testified that 'As far as advocating for [E.S.], I feel like we always did well at overcoming some, you know – sometimes things got a little tense in IEP meetings as far as what they could do, couldn't do, what we felt was best for her, but we always worked it out. And it was always talked about. We were able to come to an agreement and form a plan that I thought we were all on the same page about all the time.' (Hr. Transcript, Vol. III, p. 495, Lines 3-10).

**Reflection Room**

80. The Reflection Room was a room where a student could 'cool down' or take a break. The student can return to their classroom when they have completed an 'exit ticket' or a classroom assignment. If a student refuses to complete the 'exit ticket' or assignment, then school staff will 'wait them out.' There is no limit to how much time a student can spend in the Reflection Room. (Hr. Transcript, Vol. IV, p. 798, Lines 7-24).

81. The Reflection Room is the size of a small workroom. It does not have a window to the outside. The floor is not carpeted. It has a sink, a countertop, and some cabinets. A desk and chair can be brought in if a student chooses to sit and complete their work. (Hr. Transcript, Vol. IV, p. 799, Lines 2-20).

82. The 'grumpy room' was another name for the Reflection Room. Only one student could be placed in the Reflection Room at one time. (Hr. Transcript, Vol. IV, p. 797, Lines 25, p. 798, Lines 1-5).

83. Ms. Carnall testified that at times, E.S. had to be transported from the hall to the Reflection Room. She stated that they do not carry a student and that

8

if a student lifts their feet off the ground, they stop the transport. (Hr. Transcript, Vol. IV, p. 777, Lines 7-13, P. 785, Lines 7-25).

84.    School staff kept a log of the time that E.S. spent in the Reflection Room. The log shows that on some days, E.S. spent several hours in the Reflection Room. (Hr. Transcript, Vol. I, p. 133, Lines 8-10, Exhibit 19).

85.    Ms. Carnall witnessed E.S. causing injuries to other school staff while E.S. was in the Reflection Room. (Hr. Transcript, Vol. IV, p. 768, Lines 16-24).

86.    School staff would attempt to deescalate E.S.'s behavior by 'try[ing] to talk to her … giv[ing] her her space … just kind of back away.' However, they could not leave her by herself in the Reflection room, so if they had to be in there, they 'would just give her space.' (Hr. Transcript, Vol. IV, p. 769, Lines 3-11).

87.    K.W. testified at the hearing that she believes that the documentation shows that E.S only becomes involved in 'what the school staff says is hand-to-hand combat' after E.S. has been transported or restrained and taken to the grumpy room or the Reflection Room. (Hr. Transcript, Vol. III, p. 588, Lines 1-10).

## August 2018 - December 2018

91.    On November 8, 2018, E.S. received a Disciplinary Referral. The description for the infraction states that E.S. ran from an adult and then was taken to the Reflection Room. She then tore up her work and said, "I hate you". She also hit two adults multiple times while trying to run again. As a consequence, E.S. received a one day of out of school suspension. (Exhibit 10).

92.    The behavior data collected for November showed that E.S. was removed from the class four times, eloped from the class twice and fell asleep in class five times. (Exhibit 8).

93.    Eloping was added to the BIP as a new target behavior but sleeping was not. (Hr. Transcript, Vol. I, p. 86, Lines 5-7).

94.    Ms. Camp testified that they 'didn't have any trouble at the beginning of the year. Everything basically happened after Novemberish', although there was a period in December where things were good and then it got worse after Christmas break. (Hr. Transcript, Vol. IV, p. 796, Lines 20-25, p. 797, Lines 1).

95.    Ms. Kean testified that E.S. did well the first semester of the school year. Her behavior changed drastically around mid-January, when E.S. began shutting down. (Hr. Transcript, Vol. IV, p. 847, Lines 3-9).

9

## U. S. Army Involvement

104.    Pauline Hutchinson was the military school liaison officer for Rossview. (Hr. Transcript, Vol. II, p. 294, Lines 16-19).

105.    A military school liaison officer serves as a bridge between the military community and the schools in that community of the installation. (Hr. Transcript, Vol. II, p. 295, Lines 2- 4).

107.    Ms. Haller testified at the hearing that she reached out to Ms. Hutchinson for advice concerning E.S.'s situation at Rossview. Ms. Haller explained that she "was asking for any direction or insight. Maybe there were just things that [Ms. Hutchinson] could, you know, had access to, or services that she knew of that we couldn't access because they were military dependents on post, with things that maybe a regular community member would not have access to, you know, and if there's other things that are available after working there for so many years. So just looking for advice. We were at our wit's end with trying to help E.S and work with the parents, and I was gonna welcome any, any and all advice.' (Hr. Transcript, Vol. II, p. 297, Lines 15-25, p. 298, Lines 1-3, p. 324, Lines 21-25, Exhibit 37).

108.    Ms. Haller also testified at the hearing that she shared information about E.S. with Ms. Hutchinson to enlist her support in identifying possible services that could assist the school with E.S. (Hr. Transcript, Vol. II, p. 322, Lines 7-25).

## SRO Involvement

131.    As part of her law enforcement duties, Detective Largent wrote and filed several incident reports documenting E.S.'s behavior at Rossview. (Exhibit 56).

132.    On November 8, 2018, Detective Largent responded to a call from School staff advising that E.S. was attempting to elope from school. E.S. was located and taken to the reflection room where she attacked two school staff. After school staff back away, E.S. repeatedly rammed herself into the door attempting elopement. School staff placed themselves between E.S. and the door to prevent E.S. from harming herself at which point E.S. became aggressive towards the two school staff again. (Exhibit 107).

133.    On November 9, 2019, K.W. attempted to drop off E.S. at Rossview despite the fact that E.S. had been suspended from school for the previous day's incident. School staff would not allow E.S. to enter school that day. K.W. advised E.S. that she could hit everyone, referring to the teachers at Rossview and made an explicit derogatory remark regarding the school staff. (Exhibit 108, Hr. Transcript Vol. IV, p. 883, Lines 13-15).

10

134. On January 18, 2019, Detective Largent responded to a call from school staff advising that E.S. was attempting to elope. E.S. was taken to the reflection room where she assaulted three school staff and Detective Largent who placed herself between E.S. and school staff. (Exhibit 107).

135. On January 28, 2019, Detective Largent responded to a call from school staff involving E.S. who had attempted to elope from the school building. E.S. was taken to the reflection room where she attacked three school staff and rammed herself against the door attempting to elope. After a calming period E.S. was allowed to leave the reflection room to use the restroom but she attempted to elope again. E.S. was transported back to the reflection room where she attacked four school staff. Detective Largent attempted to intervene and was also attacked. (Exhibit 56).

136. On January 31, 2019, Deputy Melissa Smith was called to Rossview because E.S. had walked out of the building. Upon arriving at Rossview Deputy Smith observed E.S., who had been brought back into the building, assaulting three school staff by punching and kicking them. When Deputy Smith attempted to intervene E.S. attempted to assault her. K.W. was called to pick up E.S. from Rossview but K.W. refused. Deputy Smith reported the incident to the Tennessee Department of Children's Services (DCS). (Exhibit 56).

137. To this point Detective Largent had declined to file juvenile petitions against E.S. because of her age. According to Detective Largent the judge typically will not hear cases for juveniles under the age of 12. (Exhibit 56). (Hr. Transcript Vol. IV, p. 894, Lines 13-14).

138. On February 20, 2019, Detective Largent E.S. responded to a call from school staff involving E.S. who was assaulting school staff. E.S. hit Toni Smith in the eye with a toy goose and punched Ms. Camp in the nose causing it to bleed. At the time of Detective Largent's arrival E.S. was in the reflection room assaulting Ms. Camp and Ms. Carnall. In addition to punching and kicking both school staff she placed both hands around their necks. As Ms. Camp and Ms. Carnall attempted to move away from E.S. she continued to charge and attack them by punching, kicking, and grabbing their necks. Detective Largent attempted to place herself between E.S. and school staff but E.S. assaulted her while attempting to get around her to continue the attack on Ms. Camp who was being punched in the face at the time Detective Largent stepped between them. Detective Largent asked the school staff to leave the room. E.S. began ramming her body and head into the door and Ms. Work, Ms. Camp and Ms. Carnall reentered the room in attempt to prevent E.S. from harming herself. E.S. began assaulting the three school staff once they reentered. School staff phoned K.W. and S.W. in order to have E.S. picked up from school but after one hour with no response mobile crisis was called. (Exhibit 108).

11

139.     Following the February 20, 2019, incident Detective Largent filed a juvenile petition. (Hr. Transcript Vol. IV, p. 899, Lines 1-2).

140.     On February 21, 2019, Detective Largent heard E.S. screaming in the hallway when she arrived at Rossview. She observed E.S. hitting and pushing Ms. Work and Ms. Carnall. E.S. then ran down the hallway to the administration offices where she picked up a small wooden chair holding it over her shoulder in a manner that made Detective Largent believe that E.S. was going to strike her with it. After the chair was removed from E.S. she picked up a door stopper and began to hit Ms. Carnall with it. Detective Largent stepped between E.S. and Ms. Carnell who left the area while E.S. chased her into the hallway. (Exhibit 108).

141.     On February 22, 2019, Detective Largent heard loud banging noises emanating from a workroom. Upon entering the room, she observed E.S. banging the wall with a jump rope handle. When a staff member attempted to intervene, E.S. locked herself in a staff bathroom. Ms. Camp and Ms. Work unlocked the bathroom and removed the jump rope. E.S. then became aggressive towards Ms. Camp and Ms. Work and attempted to flee the workroom. Detective Largent blocked the door to prevent elopement and E.S. kicked her in the groin. E.S. then assaulted Ms. Camp and Ms. Work, hitting, and kicking both school staff. E.S. grabbed Ms. Camp's shirt collar and attempted to strangle her. E.S. broke shelving and used a broken shelf as a weapon. At one-point E.S. placed a plastic tablecloth over her head which was removed because of safety concerns. During the attempted removal of the plastic tablecloth E.S. ripped a portion off and placed it over her nose and mouth. Detective Largent removed the plastic from E.S.'s nose and mouth to prevent self-harm. E.S. then chased Ms. Camp around the room hitting her and pulling her collar restricting her ability to breathe. Once K.W. arrived E.S. stopped the assaultive behavior. (Hearing Exhibit 108)

142.     On March 6, 2019, E.S. again attempted to elope. She entered a hallway restricted to students because it led to a mechanical room, electrical room, and equipment storage. E.S. was transported out of that hallway for her own safety by Ms. Adkins and Ms. Camp. During the incident multiple school staff were assaulted. E.S. was transported to the reflection room where she put both hands around her own neck in an attempt to strangle herself. EMS was called and EMS staff strapped E.S. to a gurney to prevent self-harm and to prevent E.S. from hitting them. E.S. was loaded into an ambulance but was released to K.W. and S.W. who refused the medical transport. Detective Largent reported the incident to DCS. (Exhibit 108)

### January 2019 – March 2019

144.     K.W. testified at the hearing that prior to January 2019, she had a good

relationship with E.S.'s IEP team. (Hr. Transcript, Vol. III, p. 495, Lines 19-21).

145.  On January 15, 2019, E.S. was restrained by Ms. Work and Ms. Camp. The restraint occurred in the Reflection Room after E.S. began hitting and kicking adults. E.S. was warned prior to the restraint that if she didn't stop hitting and kicking, she would be restrained using a two-man seated hold. E.S. had been transported to the Reflection Room because she refused to do her work, refused to take a break, and refused to call her mother. (Exhibit 14).

146.  If an IEP does not include a provision for restraint, then an IEP meeting must be held within 10 days of every restraint. (Hr. Transcript, Vol. III, p. 710, Lines 19-25).

147.  The school did not follow-up with an IEP meeting within the 10 days required by law. (Hr. Transcript, Vol. I, p. 111, Lines 24-25, p. 112, Line 1).

148.  It is noted that the school attempted to schedule an IEP meeting twice to discuss adding restraint to the IEP, however, K.W. was the individual who declined the first meeting attempt because she did not receive 10 days' notice, although she acknowledged in her testimony that apparently she received an email regarding the February 5th , 2019, meeting to conduct an IEP meeting and watch video that she had requested, and canceled the second meeting because of homecoming. (Exhibit 83) (Hr. Transcript Vol. III, p. 501, Lines 11-14, p. 507, Lines 6-12).

149.  On January 18, 2019, E.S. was restrained twice by Ms. Camp and Ms. Carnall. Prior to the restraint, E.S. had eloped her classroom and was transported to the Reflection Room. Once in the Reflection Room, she began hitting, kicking, and punching the adults. She was warned she would be restrained if she continued. (Exhibit 15).

150.  On January 22, 2019, E.S. was restrained four times by Ms. Camp, Ms. Carnall and Ms. Atkins. (Exhibit 51).

151.  Beginning in late January, Ms. Carnall was assigned to work with E.S. every day in an "ISS" setting. Ms. Carnall was assigned to work with E.S. because E.S.'s behaviors had escalated and she was eloping from the classroom and wandering the halls. When E.S. began the school day, she was offered a choice as to whether she wanted to go to her classroom to complete her work or go to her 'office' to complete her work. E.S.'s office was a room that was also used for in-school suspension. If E.S. chose the office, then she would be asked to complete her classwork. If she refused, the staff would give her some time and then reiterate their request that she complete

13

her work. (Hr. Transcript, Vol. IV, p. 773, Lines 6-19, p. 774, Lines 8-10, p. 786, Lines 8-20, p. 787, Lines 1-4, Exhibit 91 and 92, p. 793, Lines 9-23, p. 794, Lines 7-11, Line 20-24, Exhibit 95).

152. Ms. Carnall testified at the hearing that she had sustained injuries that were inflicted by E.S. (Hr. Transcript, Vol. IV, p. 763, Lines 20-25, p. 764, Lines 1-22).

153. Ms. Carnall stated that the injuries would occur when E.S. did not want to work. (Hr. Transcript, Vol. IV, p. 768, Lines 10-12).

161. After the "ISS setting" plan was implemented, E.S.'s behaviors were worse. (Exhibit 91).

162. On January 28, 2019, E.S. was restrained three times by Ms. Camp and Ms. Carnall for hitting, kicking and biting adults. (Exhibit 16, Exhibit 53).

163. On January 29, 2019, E.S. received another Disciplinary Referral for eloping, hitting, kicking, pushing and using profanity with adults. As a consequence, she was forced to spend time in the Reflection Room. (Exhibit 11).

164. That same day, E.S. was restrained six times by Ms. Camp, Ms. Castleman, and Ms. Carnall for hitting, kicking and pushing adults. (Exhibit 50, Exhibit 54).

165. Ms. Camp testified at the hearing that they considered whether the "ISS setting" plan should be discontinued, but the school staff decided that they did not have any other options. (Hr. Transcript, Vol. IV, p. 795, Lines 3-13).

168. On February 1, 2019, E.S. was restrained by Ms. Camp and Ms. Carnall after E.S. spent 40 minutes hitting, kicking, punching and choking adults. Prior to the restraint, E.S. was warned she would be restrained if she did not stop aggressing. (Exhibit 17).

169. Sometime in late January, K.W. noticed that E.S. had bruises on her arms and torso. When asked what led to the bruising, E.S. responded that they happen at school from her teachers holding and restraining her. (Hr. Transcript, Vol. III, p. 502, Lines 23-25, p. 503, Lines 1-15, p. 504, Lines 1-5, Exhibit 73).

171. Eventually, the school agreed to allow K.W. to view some of the video footage. Rossview informed the army command that K.W. would require an escort at the meeting. (Hr. Transcript, Vol. III, p. 500, Lines 6-18, p. 505, Lines 21-23, Line 25, p. 506, Lines 1-5).

14

175. K.W. testified that the video showed the following: E.S. was in a hallway. E.S. was not hitting or yelling. Ms. Work appeared to be pointing for E.S. to walk in a particular direction. 'All of a sudden, they pick her up. I describe it as like a crucifix like you use on a cross. Each adult grabbed the side of her arm, and they lift her, to me, it looks a significant distance off the ground, a foot or two, and they just carry her down the hallway like that.' (Hr. Transcript, Vol. III, p. 509, Lines 6-25).

176. Sergeant Brotsch testified that the video footage showed E.S. being scooped up by two adult women. (Hr. Transcript, Vol. II, p. 342, Lines 20-25, p. 343, Lines 1-9).

184. On February 8, 2019, Holly Jackson met with E.S. to discuss planning goals and rewards that E.S. might like. At one point, Ms. Jackson asked E.S. if she was thinking about what she might like to work for and E.S. responded by saying 'No. I'm thinking about how I could sabotage this plan.'

185. On February 11, 2019, Ms. Haller emailed other school staff stating that the purpose of an upcoming IEP meeting was to add restraint language to E.S.'s IEP. (Exhibit 39).

186. Ms. Jackson responded to the email, stating that K.W. does not have to agree with the proposal to add restraint language to the IEP and that K.W. 'could file due process if she chooses.' (Exhibit 82).

187. Ms. Haller testified at the hearing that she agreed with adding restraint language to the IEP because 'things had escalated to that degree that, that there was a threat to her or others.' (Hr. Transcript, Vol. II, p. 318, Lines 2-6).

203. On February 22, 2019, the IEP team met at Rossview. CSM Martinez attended the meeting also. When they arrived at the school, he and K.W. were taken to a room where E.S. was being held because she was out of control earlier that day. CSM Martinez testified that the room reminded him of a detention room from his memories as a youngster and that a teacher guarded the doorway blocking E.S. from leaving. (Hr. Transcript, Vol. II, p. 263, Lines 2-25).

204. At the meeting, the school members of the team proposed adding restraints to E.S.'s IEP, but K.W. would not consent. K.W. requested that E.S. be removed from the ISS setting and placed back in her general education classroom and the team agreed. (Hr. Transcript, Vol. III, p. 532, Lines 12-25, p. 533, Lines 1-9, Exhibit 24).

205. The IEP was also amended to provide a 1:1 aide in the general education and special education setting for a trial period of one month. (Hr. Transcript,

15

Vol. I, p. 158, Lines 9- 21, Exhibit 23).

211. K.W. testified that she believed E.S. could follow school rules when E.S. had the right supports and was in a supportive environment. (Hr. Transcript, Vol. III, p. 589, Lines 1-19).

212. It is noted that E.S. follows school rules at Sumner Academy with no supports in place. (Hr. Transcript Vol. III, p. 638, Lines 22-25, p. 639, Lines 1-25, p. 640, Lines 1-25, p. 641, Lines 1-25, p. 642. Lines 1-5).

213. According to Ms. Melinda Dillehay E.S. is capable of following school rules and does so. (Hr. Transcript Vol. III, p. 642, Lines 6-15).

227. Ms. Haller testified that she and Ms. Camp were attending a meeting at central office the morning of March 6th. When Ms. Haller arrived at the school, she saw E.S. lying on the floor attempting to bang her head. (Hr. Transcript, Vol. II, p. 329, Lines 16- 25, p. 330, Lines 1-9).

228. School staff at Rossview called K.W. and S.W. to notify them that E.S. was trying to commit suicide and that the school staff had called an ambulance. K.W. asked to speak with E.S. When the phone was put on speaker, K.W. could hear E.S. screaming 'Let me go'. K.W. asked the school staff to release E.S. so that K.W. could speak to her, but the school staff would not release E.S. (Hr. Transcript, Vol. III., p. 510, Lines 7-25, p. 511, Lines 1-25, p. 512, Lines 1- 6).

231. When K.W. and S.W. arrived at the school, they did not see an ambulance. They waited for several minutes in the front office until they were addressed by a Rossview staff member. After inquiring about where E.S. was, they were informed that the front office did not have communication with the school staff who were with E.S. After several minutes, K.W. and S.W. were Informed that E.S. was being loaded in an ambulance at the back of the school. (Hr. Transcript, Vol. II, p. 277, Lines 1-16, Vol. III, p. 512, Lines 16- 21, p. 513, Lines 1-25, p. 514, Lines 1-25, Exhibit 36).

234. When K.W. asked that E.S. be released to her, the law enforcement officers stated that they had legal documents to take E.S. into custody. However, after speaking with the EMS supervisor, K.W. and S.W. were permitted to leave with E.S. (Hr. Transcript, Vol. II, p. 279, Lines 23-25, p. 280, Lines 2-14, Vol. III, p. 517, Lines 14-17, Exhibit 36).

235. K.W. and S.W. transported E.S. to the emergency room at Blanchfield Army Community Hospital where they were met by behavioral health. Behavioral health was on-scene due to the claim that E.S. was suicidal. After behavioral health evaluated E.S., they determined that she was not a threat to herself and they released her to her parents. (Hr. Transcript, Vol.

II, p. 280, Lines 16-22, p. 518, Lines 8-23).

**Truancy Petition**

240.   After the March 6th incident, K.W. testified that she no longer believed that E.S. was safe at school and did not send her back to Rossview. (Hr. Transcript, Vol. III, p. 524, Lines 14-23).

241.   K.W. began looking at other placement options for E.S. They considered private placements and inquired about placement options within the school district. (Hr. Transcript, Vol. III, p. 525, Lines 17-21, p. 526, Lines 2-18).

242.   K.W. requested that E.S.'s work be sent home from school and Ms. Kean sent the work home with E.S.'s brother. (Hr. Transcript, Vol. III, p. 527, Lines 1-8, Exhibit 60).

244.   On March 15, 2019, K.W. informed CMCSS that E.S. would not be returning to Rossview. (Exhibit 57).

245.   On March 15, 2019, Dr. Mason Bellamy, the Director of Elementary Schools, sent K.W. an email outlining the placement options for E.S. The offer from the district included: (1) implementing E.S.'s IEP at Rossview; (2) Virtual school or (3) homebound instruction which could begin if the IEP team felt appropriate and once the proper documentation was present. (Exhibit 63).

246.   K.W. did not believe that any of these placement options would work for E.S. (Hr. Transcript, Vol. III, p. 560, Lines 1-24).

249.   On May 6, 2019, E.S.'s lawyer informed CMCSS that E.S. would be enrolled in an umbrella homeschool. (Exhibit 57).

250.   On May 15, 2019, having received no proof that E.S. had been enrolled at an umbrella homeschool, the school district filed a truancy petition for E.S. with the Juvenile Court of Montgomery County. (Exhibit 57).

251.   The district did not hold a manifestation determination hearing prior to filing the truancy petition due to E.S.'s non-enrollment. (Hr. Transcript, Vol. III, p. 531, Lines 7-9, Exhibit 57).

252.   For the schoolyear 2018-2019 E.S. had 58 unexcused absences (4 due to suspension and 47 due to non-enrollment). E.S. was also tardy 11 times and dismissed early 7 times during the same schoolyear. (Exhibit 57).

17

**Sumner Academy**

255. E.S. began attending Sumner Academy in July of 2019. (Hr. Transcript, Vol. III, p. 541, Lines 1-17).

256. E.S. has been consistently attending Sumner Academy and is doing well academically. (Exhibit 58).

257. Sumner Academy is accredited by the Southern Association of Colleges and Schools. They have been accredited since 1985. (Hr. Transcript, Vol. III, p. 622, Lines 7- 13).

265. Sumner Academy does not have IEPs, special education teachers, behavioral services, behavior specialists, psychologists, written behavioral plans or written functional behavioral assessments. Sumner Academy provides no direct special education related services, whatsoever. (Hr. Transcript, Vol. III, p. 638, Lines 22-25, p. 639, Lines 1.25, p. 640, Lines 1-25, p. 641, Lines 1-10).

**Expert Testimony by Geoffrey Ferris**

266. Geoffrey Ferris testified as an expert for the Petitioners.

268. In Mr. Ferris' opinion, the school district did not allocate the necessary services or consult with the appropriate professionals when implementing E.S.'s IEP at Rossview. (Hr. Transcript, Vol. II, p. 387, Lines 25, p. 388, 1-20).

271. In Mr. Ferris' opinion, the school district mis-analyzed the function of E.S.'s behavior. 'Theoretically, there shouldn't have been 21 restraints for, if you hit the function– if you had the right function, if you had the right environmental antecedents and the right consequences in place for this child.' (Hr. Transcript, Vol. II, p. 390, Lines 20-22, p. 392, Lines 6-10).

279. Mr. Ferris further testified that district staff over-utilized punishment and used it excessively (i.e., restraints, suspension, removal from class, forced removal) in its behavioral treatment of E.S. (Hr. Transcript, Vol. II, Page 411, Lines 15-25).

280. According to Mr. Ferris this is supported by data he reviewed where the district used 21 restraints in 18 days, where the previous year she had only a single office referral. According to Mr. Ferris, it is excessive because, best practices are to exhaust all preventative, proactive strategies prior to even considering the use of the punishment contingency. *Id.*

282. When questioned about the absence of a behavior plan at Sumner Academy,

> Mr. Ferris' stated that the fact that there weren't any 'challenging behaviors that would show me that all the professionals' behaviors leading up to good behavior that I'm witnessing is part of the behavior management strategy because the goal is to prevent versus react, in essence.' (Hr. Transcript, Vol. II, Page 461, Lines 3-9).

Docket No. 32-1.

### IV.     Evidentiary Hearing Before the Undersigned

The undersigned permitted Plaintiffs to supplement the administrative record by submitting video evidence. Docket No. 29; supplementing Docket No. 15.

On November 8, 2022, the undersigned held an evidentiary hearing in this matter. *See* Docket No. 42, Sealed Transcript. The purpose of the hearing was the presentation and admission of additional evidence, including depositions, video recordings, and further testimony from Mr. Ferris, which have been incorporated into the record considered herein. *Id.*

### V.     Law and Analysis

### A.     Individuals with Disabilities Education Act - 20 U.S.C. § 1400, *et seq*.

The IDEA is a federal statute that requires states receiving federal funds for education ensure all children with disabilities have access to a free appropriate public education ("FAPE") designed to meet their unique needs. *Burilovich ex rel. Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F. 3d 560, 565 (6th Cir. 2001), *citing* 20 U.S.C. §§1400(d)(1)(A), 1401(25), 1412. A FAPE consists of special education and related services that meet the standards of the State Educational Agency ("SEA") and are provided in conformance with an Individualized Education Program ("IEP"). 20 U.S.C. §1401(9).

The IDEA requires that schools prepare an IEP that provides the student a FAPE that: "(1) complies with the procedures set forth in the IDEA, and (2) is reasonably calculated to enable the [student] to receive educational benefits." *Id.*, *citing Bd. Of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982). Stated differently, "To meet its substantive

19

obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*,137 S. Ct. 988, 999 (2017).

An IEP must include, *inter alia*, a statement of the child's present levels of performance; a statement of measurable annual goals; a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research; an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in nonacademic and extracurricular activities; and a statement of how the child's parents will be regularly informed of their child's progress. 20 U.S.C. § 1414(d)(1)(A). These are "the requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. v. Boss*, 144 F. 3d 391, 398 (6th Cir. 1998). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999. After all, "the IDEA does not guarantee success – it only requires a school to 'provide sufficient specialized services so that the student benefits from [their] education." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F. 3d 604, 614 (6th Cir. 2006).

The IDEA additionally establishes formal administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE (including challenging the IEP). *See*, *e.g.*, 20 U.S.C. § 1415(a). One of those procedures is the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).  Any complaints must be given an impartial due process hearing, and, if necessary, a review by a higher state agency. 20 U.S.C. §§ 1415(f), (g). Persons dissatisfied with the results

20

of the administrative hearing and appeal may, after exhausting their administrative remedies, file

suit in state or federal court for judicial review of the administrative decision. 20 U.S.C. §§ 1415(I),

(l). The party challenging the decision has the burden of proof to show by a preponderance of the

evidence that the IEP was inappropriate. *Deal v. Hamilton Cty. Bd. Of Ed.*, 392 F.3d 840, 854 (6th

Cir. 2004).

Absent a few exceptions, plaintiffs must exhaust their administrative remedies before filing

a civil action to enforce their rights under the IDEA. *Id.* The party bringing the action has 90 days

from the date of the decision of the hearing officer to file suit. 20 U.S.C. § 1415(i)(2)(B).

Additionally, when a plaintiff alleges injuries that "could be redressed to any degree by the

IDEA's procedures and remedies, exhaustion of those remedies is required." *S.E. v. Grant Cnty.*

*Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008).

Determining whether the exhaustion requirement is triggered centers on whether the suit

seeks relief for the denial of a FAPE. *Fry v. Napoleon Community Schools, et al.*, 137 S. Ct. 743

(2017). As the Supreme Court stated:

> [T]o meet that statutory standard, a suit must seek relief for the denial of a FAPE,
> because that is the only "relief" the IDEA makes "available." . . . [I]n determining
> whether a suit indeed "seeks" relief for such a denial, a court should look to the
> substance, or gravamen, of the plaintiff's complaint.

*Fry, supra.*

The *Fry* Court explained:

> . . . A court deciding whether §1415(l) applies must therefore examine whether a
> plaintiff's complaint - the principal instrument by which she describes her case -
> seeks relief for the denial of an appropriate education.

> But that examination should consider substance, not surface. The use (or non-use)
> of particular labels and terms is not what matters. The inquiry, for example, does
> not ride on whether a complaint includes (or, alternatively, omits) the precise words
> "FAPE" or "IEP." After all, §1415(l)'s premise is that the plaintiff is suing under
> a statute *other than* the IDEA, like the Rehabilitation Act; in such a suit, the plaintiff

21

might see no need to use the IDEA's distinctive language - even if she is in essence contesting the adequacy of a special education program. And still more critically, a "magic words" approach would make §1415(l)'s exhaustion rule too easy to bypass. . . . Section 1415(l) is not merely a pleading hurdle. It requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.

. . .

One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school - say, a public theater or library? And second, could an *adult* at the school - say, an employee or visitor - have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

. . .

A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute - thus starting to exhaust the Act's remedies before switching midstream. . . . A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE - with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy. . . . But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term.

*Fry, supra* (italics in original).

In a lawsuit challenging an IDEA administrative decision, the district court will undertake a "modified de novo review" of the administrative decision. *Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S. Ct. 3034 (1982). In doing so, the district court must make an independent examination of the evidence and base its decision on a preponderance of the evidence contained

22

in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings, particularly when educational expertise is essential to those findings. *See M.G. by & through C.G. v. Williamson Cty. Sch.,* 720 F. App'x 280, 283 (6th Cir. 2018), *quoting Deal v. Hamilton Cty. Bd. of Educ.*, 392 F. 3d 840, 849 (6th Cir. 2004); *Berger v. Medina City Sch. Dist.,* 348 F. 3d 513, 519 (6th Cir. 2003); *N.L. v. Knox County Sch.,* 315 F. 3d 688 (6th Cir. 2003); *Knable v. Bexley City Sch. Dist.,* 238 F. 3d 755, 764 (6th Cir.), *cert. denied,* 533 U.S. 950, 121 S. Ct. 2593 (2001); *Burilovich v. Board of Educ. of Lincoln Consol. Sch.,* 208 F. 3d 560, 565 (6th Cir.), *cert. denied,* 531 U.S. 957, 121 S. Ct. 380 (2000). The "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *M.G. by & through C.G.,* 720 F. App'x at 283; *Berger*, 348 F. 3d at 519; *Burilovich,* 208 F. 3d at 567; *see also,* 20 U.S.C. § 1415(i)(2).

Where a school district fails to provide a FAPE, the IDEA authorizes a court to grant reimbursement for the cost of private education when a parent or guardian unilaterally enrolls a child in an appropriate private school. 20 U.S.C. § 1415(i)(2)(C)(iii). *See also Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993); *Burlington*, 471 U.S. at 370. Parents seeking reimbursement for a private placement bear the burden of demonstrating that it was appropriate. *Dong v. Bd. Of Educ. Of Rochester Cnty. Sch.*, 197 F. 3d 793, 799 (6th Cir. 1999). Parents withdrawing their public-school student in favor of a private school education "do so at their own financial risk." *Sch. Comm. Of Town of Burlington v. Dep't of Educ. Of Mass.,* 471 U.S. 359, 369-70 (1985).

A unilateral private placement does not satisfy the IDEA unless it "'at a minimum, provides

23

some element of special education services, in which the public-school placement was deficient';
for example, specific special-education programs, speech or language therapy courses, or pre-
tutoring services." *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 791 (6th Cir. 2018),
*quoting Berger*, 348 F.3d at 523.

### B.  Special Education Behavioral Supports Act  ("SEBSA)" – Tenn. Code Ann. §§ 49-10-1301, et seq.

The Tennessee Special Education Behavior Supports Act ("SEBSA") was enacted to:
(1) ensure that every student receiving special education services is free from the unreasonable,
unsafe and unwarranted uses of isolation and restraint practices; (2) encourage the use of positive
behavioral interventions and support methods in schools; (3) develop properly trained staff in order
to promote positive behavioral supports that reduce dependence on isolation and restraint
practices; and (4) ensure that teachers of students receiving special education services are properly
trained to protect the student, teacher and others from physical harm, if isolation or restraint is
necessary. Tenn. Code Ann. §§ 49-10-1302.

The SEBSA provides the following definitions relevant to the instant action:

(1)     "Behavior intervention training program" means a training program in
        evidence-based positive behavioral supports, evidence-based crisis
        intervention, and evidence-based techniques for the safe use of isolation and
        restraint;

                                *       *       *

(3)     "Emergency situation" means that a student's behavior poses a threat to the
        physical safety of the student or others nearby;

(4)     "Isolation" or "seclusion":

        (A)     Means the confinement of a student alone, with no other
                students, staff, or persons present, in a room with or without
                a door or other enclosed area or structure pursuant to § 49-
                10-1305(g) where the student is physically prevented from
                leaving because a door, object, or school personnel is

24

blocking the student's exit; and

(B)     Does not include time-out, a behavior management procedure in which the opportunity for positive reinforcement is withheld, contingent upon the demonstration of undesired behavior; provided, that time-out may involve the voluntary separation of a student receiving special education services from others;

(5)     "Isolation room" means any space, structure, or area pursuant to § 49-10-1305(g) used to isolate a student;

\*          \*          \*

(8)     "Physical holding restraint" means the use of body contact by school personnel with a student to restrict freedom of movement or normal access to the student's body, except for:

(A)     The holding of a student by an adult in order to calm or comfort the student in the absence of an emergency;

(B)     Contact necessary to physically escort a student from one area to another in the absence of an emergency;

(C)     Assisting a student in completing a task or response if the student does not resist or if the resistance is of minimal intensity or duration;

(D)     Physically redirecting a student if the student does not resist or if the resistance is of minimal intensity or duration; or

(E)     School personnel blocking a student's exit or elopement by physically placing themselves in front of the student;

Tenn. Code Ann. § 49-10-1303.

Regarding to the use of isolation or restraint, SEBSA provides:

(a)     For a student receiving special education services, as defined by § 49-10-102, isolation or a physical holding restraint may only be used in emergency situations.

(b)     Individualized education programs that provide for the use of isolation or a physical holding restraint for certain behavior must contain a data driven functional behavior assessment and a plan for modification of the behavior developed and implemented by a qualified team of professionals.

25

(c)  In the event that a physical holding restraint or isolation is imposed on a student, it shall be imposed by:

(1)  School personnel who have been trained and certified for completing a behavior intervention training program; or

(2)  Other school personnel when trained and certified personnel are not immediately available.

(d)  If school personnel impose isolation or restraint, then the school shall immediately contact appropriate school personnel who are designated under department rules to authorize the isolation or restraint. The school personnel authorized by the department's rules to authorize isolation or restraint must observe and evaluate the student's condition within a reasonable time after the isolation or restraint was used. The school principal, or the school principal's designee, shall notify the student's parent or guardian orally or by written or printed communication on the same day the isolation or restraint was used. The school principal, or the school principal's designee, shall be held harmless for failing to notify a student's parent or guardian in compliance with this subsection (d) if the school principal, or the school principal's designee, made a reasonable effort to notify the student's parent or guardian.

(e)  An individualized education plan (IEP) team meeting must be convened within ten (10) days of the use of a restraint if:

(1)  The student's IEP does not provide for the use of a physical holding restraint generally, or for the behavior that precipitated the use of the restraint; or

(2)  A physical holding restraint is used for an extended period of time, as determined by the state board of education.

Tenn. Code Ann. § 49-10-1304.

SEBSA also sets parameters for prohibited use of isolation or restraint in pertinent part as follows:

(c)  The use of any mechanical restraint on any student receiving special education services, as defined by § 49-10-102, is prohibited.

(d)  Any form of life-threatening restraint, including restraint that restricts the flow of air into a person's lungs, whether by chest compression or any other means, to a student receiving special education services, as defined by § 49-10-102, is prohibited.

26

(e)

      (1)    The use of isolation or restraint as a means of coercion, punishment, convenience or retaliation on any student receiving special education services, as defined by § 49-10-102, is prohibited.

. . .

    (f)    The use of a locked door, or any physical structure, mechanism, or device that substantially accomplishes the function of locking a student in a room, structure, or area, is prohibited.

Tenn. Code Ann. § 49-10-1305.

### C.    The Case at Bar

As discussed above, in a lawsuit challenging an IDEA administrative decision, the district court will undertake a "modified de novo review" of the administrative decision. *Rowley,* 458 U.S. at 206. In doing so, the district court must make an independent examination of the evidence and base its decision on a preponderance of the evidence contained in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings, particularly when educational expertise is essential to those findings. *See M.G. by & through C.G.,* 720 F. App'x at 283, *quoting Deal*, 392 F.3d at 849; *Berger,* 348 F. 3d at 519; *N.L.,* 315 F. 3d at 688; *Knable,* 238 F. 3d at 764, *cert. denied,* 533 U.S. 950, 121 S. Ct. 2593 (2001); *Burilovich,* 208 F. 3d at 565, *cert. denied,* 531 U. S. 957, 121 S. Ct. 380 (2000). Thus, the undersigned will review the record as a whole, while giving "due weight" to the ALJ's findings of fact.

As the Supreme Court stated in *Frye*, an IDEA suit must seek relief for the denial of a FAPE, because that is the only "relief" the IDEA makes "available." *Frye, supra*. A FAPE consists of special education and related services that meet the standards of the SEA and are provided in conformance with an IEP. 20 U.S.C. §1401(9). The IDEA requires that an IEP include, *inter alia*, a statement of the child's present levels of performance; a statement of measurable annual goals;

27

a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research; an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in nonacademic and extracurricular activities; and a statement of how the child's parents will be regularly informed of their child's progress. 20 U.S.C. § 1414(d)(1)(A). These are "the requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 398 (6th Cir. 1998).

"Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.* 137 S. Ct. at 999. After all, "the IDEA does not guarantee success – it only requires a school to 'provide sufficient specialized services so that the student benefits from [their] education." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F. 3d 604, 614 (6th Cir. 2006).

The IDEA also requires that school districts provide a FAPE in the least restrictive environment ("LRE") to all students with disabilities who are in need of special education and related services. 20 U.S.C. §1400 *et. seq*. In developing educational programs and determining appropriate services for those students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law. *See Bd. of Educ. of the Hendrick Hudson School Dist. v. Rowley*, 458 U.S. 176, 181, 182 (1982). However, parents are not entitled to relief for minor procedural violations alone. Technical procedural violations do not render an IEP invalid. *Dong v. Board of Educ. of Rochester Community Schs*., 197 F. 3d 793, 800 (6th Cir. 1999). Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.*, 238 F. 3d 755, 764 (6th Cir. 2001)

28

(procedural violations must cause substantive harm and constitute denial of FAPE to be actionable); *see also Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F. 3d 307, 313 (6th Cir. 2007).

In the case at bar, E.S. was initially evaluated for eligibility for special education in 2017 by Stephani Cook, a school psychologist employed by Defendant. Docket No. 15. She had been referred for a special education evaluation due to her excessive behavioral difficulties and her above average skills. *Id.* Her psychoeducational evaluation included the Reynolds Intellectual Assessment Scales, the Woodcock-Johnson Tests of Achievement, the Behavior Assessment System for Children, the Adaptive Behavior Assessment System, the Tennessee Teacher Observation Checklist for Gifted, and the Tennessee Parent Observation Checklist for Gifted. *Id.* As the record reflects and the ALJ so found, Defendant timely and properly conducted E.S.'s psychoeducational evaluation, evaluating her in all suspected areas of disability and appropriately determining that she was a student with a disability entitled to special education and related services. *See* Docket Nos. 1-1, 15.

At the hearing before the ALJ, K.W. testified that there were no problems with the IEP or E.S.'s progress for the first few years of her enrollment; K.W was involved as an IEP team member and assisted in developing the IEPs for E.S. *Id.* The IEP for the year at issue remained largely unchanged from the previous year, and there is no evidence to suggest that K.W. believed any substantive changes needed to be made. *Id.*

The Supreme Court, in *Endrew F*, determined that, for a school district to substantively offer a FAPE, an IEP must be reasonably calculated to enable a child to make progress appropriate in light of their circumstances. *Endrew F*, 137 S. Ct. at 999. The *Endrew F* Court stated that an IEP should be "construed only after careful consideration of the child's present levels of

29

achievement, disability, and potential for growth," noting, "For a child fully integrated into the regular classroom, an IEP typically should … be 'reasonably calculated to enable a child to achieve passing marks and advance from grade to grade." *Id., citing Rowley,* 458 U.S. at 203-04.

In the instant action, E.S. was enrolled in a regular education classroom with special education support. Docket Nos. 1-1, 15. She was to receive special education support so that she could derive benefit from her regular education program, receive passing grades, and advance from grade to grade. *Id.* The record reflects that E.S. is a gifted child who can actively participate in class and do the assigned work. *Id.* In fact, K.W., Mr. Ferris, Ms. Cook, Ms. Dillehay, and Ms. Work, all testified that E.S. was fully capable of following school rules and making choices, and the record reflects that when E.S. attends class and does the work, she progresses; and when she is absent from class and refuses to do the work, she does not. *Id.* E.S.'s February 8, 2019, comment to Holly Jackson about how she was "thinking about how [she] could sabotage this plan" demonstrates that she was capable of planning ways to sabotage her own progress. *Id.* As the ALJ found and the evidence supports, Defendant considered E.S.'s individual circumstances and proposed IEPs that were reasonably calculated to enable E.S. to make progress in light of her circumstances, were substantively appropriate, and met the procedural requirements of the IDEA. *Id.*

Although the parties dispute the nature, frequency, and sufficiency of communication between Defendant and K.W., the IDEA generally requires a school district to ensure that at least one parent of a child with a disability is afforded the opportunity to participate in the IEP process and is informed enough to provide consent to implement an IEP. 34 C.F.R. § 300.501. In the instant action, Defendant both allowed and encouraged K.W. to meaningfully participate in E.S.'s IEP process. Docket Nos. 1-1, 15. The record reflects that K.W. attended some IEP meetings and was

an active participant. *Id.* The record additionally reflects that K.W. also declined to schedule or cancelled other IEP meetings. *Id.* While K.W. can ultimately choose whether or not to attend meetings related to her child, the IDEA requires only that Defendant afford K.W. the opportunity to meaningfully participate in the process. Defendant did so.

With regard to Defendant's use of isolation and restraints, as discussed above, SEBSA permits isolation or a physical holding restraint in emergency situations. Tenn. Code Ann. § 49-10-1304(a). The record in the instant action reflects that K.W. told E.S. that she could hit staff members, and that E.S. was, in fact, violent toward school staff, SROs, and herself. Docket Nos. 1-1, 15. E.S. repeatedly hit, kicked, punched, pushed, bit, and choked school staff. *Id.* She threw things at them and brandished items such as a wooden chair, a door stopper, and a broken shelving piece as a weapon. *Id.* E.S. also repeatedly tried to elope from school and tried to injure herself by laying on the floor attempting to bang her head into the floor, ramming her body and head into the wall and door, placing a portion of a plastic tablecloth over her nose and mouth, and choking herself. *Id.* The record reflects that failing to intervene would likely have caused additional and more severe injuries to all involved, and school staff utilized the amount of restraint necessary to protect themselves and protect E.S. from herself. *Id.*

As set forth above, beyond the use of isolation or restraint in emergency situations, SEBSA also contains reporting and notification requirements. Specifically, SEBSA requires that when an IEP does not include a provision for isolation or restraint, then an IEP meeting must be held within 10 days of every instance where isolation or restraint is used. Tenn. Code Ann. § 49-10-104(e), (f). The record reflects that, on at least one occasion, Defendant did not follow-up with the requisite IEP meeting within the 10 days required by law. Docket Nos. 1-1, 15. The record further reflects, however, that Defendant attempted to schedule multiple IEP meetings to discuss adding restraint

31

to the IEP, but as discussed above, K.W. declined to schedule the IEP meetings or cancelled them. *Id.* Because Defendant afforded K.W. opportunities to meaningfully participate in the process, the technical violation of the 10-day meeting requirement does not impose liability.

As has been discussed, the "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *M.G. by & through C.G.,* 720 F. App'x at 283; *Berger*, 348 F. 3d at 519; *Burilovich,* 208 F. 3d at 567; *see also,* 20 U.S.C. § 1415(i)(2). The ALJ in the case at bar held a four-day administrative hearing, carefully considered the evidence, and reached a reasoned decision. After conducting an evidentiary hearing, reviewing the ALJ's decision, and considering the record as a whole, the undersigned finds that the ALJ properly determined that Defendant did not deny E.S. a FAPE. Accordingly, the undersigned recommends that Plaintiffs' Motion for Judgment on the Administrative Record be **DENIED**, and Defendant's Motion for Judgment on the Administrative Record be **GRANTED.**

Even if Defendant had denied E.S. a FAPE, however, the relief Plaintiffs seek is unavailable. When a parent or student brings a successful IDEA claim, a court may order a school to provide services to remedy the past denial of a FAPE and ensure the student receives a FAPE going forward. *Perez v. Sturgis Public Schools*, No. 20-1076 (6th Cir. 2021). Parents may also receive reimbursement for appropriate educational expenditures that the state should have paid**.** *Id.*

Parents seeking reimbursement for a private placement bear the burden of demonstrating that it was appropriate. *Dong v. Bd. Of Educ. Of Rochester Cnty. Sch.*, 197 F.3d 793, 799 (6th Cir. 1999). In order for the unilateral placement to be deemed "appropriate," "at a minimum, [the

32

placement must] provide some element of special education services, in which the public school placement was deficient'; for example, specific special-education programs, speech or language therapy courses, or pre-tutoring services." *L. H.*, 900 F. 3d 791, *quoting Berger*, 348 F. 3d at 523.

Because the only "relief" the IDEA makes "available" is relief for the denial of a FAPE; because the "relief" available for the denial of a FAPE is either an order for the school to provide services to remedy the past denial of a FAPE and ensure the student receives a FAPE going forward or tuition reimbursement for an "appropriate placement"; and because E.S. no longer attends CMCSS, such that an order directing Defendant to correct any alleged FAPE deficiency would be moot, the essential question now before the Court is whether Plaintiffs' unilateral placement of E.S. in Sumner Academy constitutes an "appropriate placement" under the IDEA such that they are entitled to the tuition reimbursement sought.

Plaintiffs argue that Sumner Academy is an appropriate placement because the teachers built a rapport with E.S., made her feel comfortable, and provided a more challenging curriculum that involved a more advanced math class, resulting in E.S. excelling. Docket Nos. 1, 47. Although Plaintiff is thriving at Sumner Academy, building a rapport, making E.S. feel comfortable, and providing a more challenging curriculum including a more advance math class does not address or correct the alleged deficiencies with E.S.'s IEPs at CMCSS, as required for recovery.

With regard to whether Sumner Academy constitutes an "appropriate placement" under the IDEA, the threshold inquiry is whether Sumner Academy provides "some element of special education services, in which the public-school placement was deficient." *L. H.*, 900 F. 3d 791, *quoting Berger*, 348 F. 3d at 523. At the hearing, Ms. Dillehay, the former direction of the lower school at Sumner Academy and current teacher there, testified that there are no certified or licensed special education teachers, no related service providers, no behavior specialists, no school

33

psychologists, no IEPs, no written behavior plans, and no written functional behavior assessments at Sumner Academy. Docket Nos. 1-1; 15. Moreover, Mr. Ferris acknowledged that E.S. has unique needs different from those of nondisabled age-appropriate peers and testified that Sumner Academy is a general education school without a special education component. *Id*. Because by definition Sumner Academy has no IEP or individualized plan of any kind for E.S., nor does it provide, nor have the capacity to provide, a program specifically designed to meet E.S.'s unique needs, it cannot provide "some element of special education services" that would address and correct the alleged deficits in Defendant's IEPs for E.S. In addition, there was no testimony from anyone that Sumner Academy had the ability to, or actually did, address the complaints that Plaintiffs had with CMCSS. Accordingly, Sumner Academy cannot be deemed an "appropriate placement" warranting reimbursement.

As has been noted, parents withdrawing their public-school student in favor of a private school education "do so at their own financial risk." *Sch. Comm. Of Town of Burlington v. Dep't of Educ. Of Mass.,* 471 U. S. 359, 369-70 (1985). While E.S.'s success at Sumner Academy is laudable, it does not change the fact that reimbursement requires a finding that the unilateral placement was "appropriate" and provided "some element of special education services" that would address and correct the alleged deficits in Defendant's IEPs for E.S., but that Sumner Academy did not, and was not, able to do so.

Because E.S. no longer attends CMCSS and an order directing Defendant to correct any alleged deficiencies in the delivery of a FAPE for E.S. would be moot, and because Plaintiffs have failed to carry their burden of establishing that Sumner Academy was an "appropriate" placement such that reimbursement would not be warranted, Plaintiffs would be unable to recover relief under the IDEA even if Defendant had denied E.S. a FAPE.

34

## V. CONCLUSION

For the reasons set forth above, the undersigned finds that Plaintiffs have failed to carry their burden and establish either that Defendant denied E.S. a FAPE or that Sumner Academy was an appropriate placement. The undersigned therefore recommends that Plaintiffs' Motion for Judgment on the Administrative Record be **DENIED**, Defendant's Motion for Judgment on the Administrative Record be **GRANTED**, and Plaintiffs' IDEA claims be **DISMISSED**.

As only Plaintiffs' IDEA claims are presently before the Court, this Report and Recommendation expresses no findings or opinions on the remainder of Plaintiffs claims. Because this case involves a minor, the undersigned further recommends that this Report and Recommendation be filed under Seal.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**

35